UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN P. DULLEA**, <br><br>        Plaintiff, <br><br> v. <br><br> **PENSION BENEFIT GUARANTEE CORPORATION**, <br><br>        Defendant. | Case No. 16-cv-00147 (CRC) |

**MEMORANDUM OPINION**

John Dullea, a participant in an ERISA pension plan administered by the Pension Benefit Guarantee Corporation ("PBGC"), petitioned the agency to change the form of benefits that his former spouse had been receiving under the plan. The PBGC denied his request, citing agency policy prohibiting such changes after benefits payments have begun. Dullea sued, and both sides now move for summary judgment. Finding the policy underlying the agency's decision to be arbitrary, capricious, and contrary to the provision of ERISA upon which it is based, the Court will grant summary judgment in favor of Mr. Dullea, vacate the PBGC's decision, and remand the case to the agency for further consideration of Mr. Dullea's request in light of this opinion.

**I.      Background**

The PBGC is an independent federal agency that was created under the Employee Retirement Income Security Act of 1974 ("ERISA") to guarantee benefits earned by participants in failed single-employer pension plans. The agency became the trustee of one such plan—the Dullea Company Inc. Defined Benefit Pension Plan—in 2007. Pro se Plaintiff John Dullea had been and remains a participant in that plan. A year after the PBGC assumed control of the plan, Dullea's former wife, Ann Marie Potrament, provided the agency a domestic relations order

issued by a court in the couple's home state of Minnesota. A.R. 8 (2008 Domestic Relations Order). The order provided that Potrament—as an "alternate payee" under the plan—was entitled to receive a separate, half share of Dullea's monthly plan benefits for the rest of her life. See id. The PBGC deemed the order to be a "qualified domestic relations order" (or "QDRO") under ERISA, and subsequently began paying benefits to Potrament in accordance with its terms. A.R. 244–45.

Four years later, in 2012, Dullea presented the PBGC with a second domestic relations order that had been recently issued by a different judge from the same Minnesota court. A.R. 222 (2012 Domestic Relations Order). The new order specified that Potrament was entitled not to a separate interest in half of Dullea's benefits payable over her lifetime, but rather to a shared interest in half of his benefits, payable only until *his* death. See id. The PBGC promptly notified Dullea that the new order was not a valid QDRO under ERISA and the agency's regulations. See A.R. 208–210 (Initial PBGC Determination). It explained that the second order was a "shared payment" order, *i.e.*, one that "gives the alternate payee a portion of the participant's benefit payments . . . during the participant's lifetime." A.R. 208. The first order, on the other hand, was a "separate interest" order, which granted Potrament her own interest in one-half the benefits over her lifetime. Id. According to the agency, once it qualifies and begins making benefits payments under a separate-interest QDRO, it cannot qualify or make payments under a different type of order. It therefore declined to revise the terms of its payments to Ms. Potrament. See id.

Dullea filed a timely appeal of the PBGC's determination to the agency's Appeals Board. See 29 C.F.R. § 4003.51. The Board denied the appeal on December 26, 2012. A.R. 1–7 (Appeals Board Decision). Quoting guidance from the agency's Operating Policy Manual, the

Board explained that the PBGC "will generally qualify a subsequent order between the same or different parties from an earlier QDRO." A.R. 4.  However, "if the parties decide that the participant's benefits will no longer be subject to a separate interest QDRO, PBGC must receive a subsequent order before the alternate payee's first payment date." Id.  And "[f]or a separate interest QDRO after the alternate payee's first payment date, PBGC will not qualify a subsequent order changing, vacating, or correcting the alternate payee's separate interest benefit amount or form provided in the original QDRO." A.R. 5.  Consistent with this policy, because the PBGC had been paying benefits to Ms. Potrament since 2009, the Appeals Board upheld the agency's refusal to qualify the 2012 domestic relations order.  See A.R. 5–7.

In December 2014, Dullea filed suit in the United States District Court of the District of Minnesota seeking review of the Appeal Board's decision.  See 29 U.S.C. § 1303(f)(1).  On the government's motion, the Minnesota District Court transferred venue to this Court in January 2016.  Mem. Op. & Order Nov. 20, 2015, ECF No. 32.  Both parties now move for summary judgment.  The Court held a hearing on the motions on March 8, 2017 at which Mr. Dullea appeared by telephone.

## II.     Standard of Review

As a government agency, the PBGC's benefit determinations are considered informal agency adjudications and assessed under the standard for judicial review set forth by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  The reviewing court must determine if the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A).  As the PBGC correctly acknowledges, courts generally limit their review to the administrative record that was before the agency at the time it rendered its decision, and consider only whether the agency has "offered a rational explanation for its

decision, whether its decision is based on consideration of the relevant factors, and whether the decision is adequately supported by the facts found." Nat'l Ass'n of Gov't Employees, Local R5-136 v. FLRA, 363 F.3d 468, 474–75 (D.C. Cir. 2004) (citing State Farm Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto Ins. Co, 463 U.S. 29, 43 (1983)).  Review of agency decisions is particularly suited for summary judgment because the court is "deciding the legal question of whether the agency could reasonably have found the facts as it did."  City & County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997) (internal citation omitted).

### III.  Discussion

The Court finds that the PBGC's decision not to qualify the 2012 domestic relations order fails to meet the applicable standard of review.  Beginning with the statute, ERISA governs the form and payment of pension plan benefits.  See 29 U.S.C. § 1056.  It generally prohibits plan participants from assigning or alienating their benefits.  Id. § 1056(d)(1).  This "non-alienation" rule does not apply, however, to assignments of benefits under "qualified domestic relations orders."  Id. § 1056(d)(3)(A).  A "domestic relations order" is an order issued by a state court that "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant."  Id. § 1056(d)(3)(B)(ii)(I).  A "qualified" domestic relations order is one that "creates or recognizes the existence of an alternate payee's rights to . . . receive all or a portion of the benefits payable with respect to a participant under a plan."  Id. § 1056(d)(3)(B)(i)(I).  For a domestic order to be qualified, it must meet certain formal requirements not at issue here, id. § 1056(d)(3)(C), and satisfy the following three conditions:

> i.  [It] does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

4

    ii. [it] does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
    iii. [it] does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

Id. § 1056(d)(3)(D)(i)-(iii).

    The PBGC has adopted internal guidelines implementing the payment of benefits under ERISA. As noted above, the Appeals Board relied on those guidelines in declining to qualify the 2012 domestic relations order presented by Mr. Dullea. Specifically, the Board cited the agency's policy of not qualifying any shared-interest domestic relations order presented after the alternate payee has begun receiving payment under a prior separate-interest order. A.R. 5. The purpose of this rule, according to the Appeals Board, is to ensure compliance with the second of the three QDRO eligibility conditions quoted above—namely, that the order "does not require the plan to provide increased benefits (determined on the basis of actuarial value)." Id. The Board explained that replacing a separate-interest QDRO with a shared-interest QDRO could "potentially" require the plan "to provide increased benefits." Id. That is so because if the alternate payee were to die before the participant in a separate-interest scenario, her benefits would cease upon her death. But in a shared-interest scenario, the total benefits paid would potentially be greater, since the alternate payee's benefits would revert to the participant and continue as long as he lived.[1] A.R. 6. "To avoid the potential of violating ERISA

---

[1] The Appeals Board illustrated this point with a hypothetical scenario involving an alternate payee who learns she has a terminal illness two months after beginning to receive payments under a separate-interest order. In such a scenario, the separate-interest payments would stop upon her premature death. However, if a subsequent QDRO converted the separate interest to a shared interest, the plan would likely pay increased benefits because the alternate payee's designated share of benefits would revert back to the participant until his death, which would likely occur after the alternate payee's death. See A.R. 5–6.

5

§ 1056(d)(3)(D)(ii)," the Appeals Board reasoned, "PBGC does not qualify a domestic relations order that changes the form of any benefit that is already in pay status at the time the order submitted regardless of the reported or assumed health status of the alternate payee and the participant." Id.

The Board's reliance on the PBGC's "already in pay status" policy to affirm the agency's decision suffers from two related problems. First, § 1056(d)(3)(D)(ii) excludes from qualification only those domestic relations orders that require the payment of increased benefits. That condition necessarily implies that Congress intended for the agency to make some type of determination as to whether a specific order will (or, more accurately, is likely to) increase overall benefits payments. Yet the agency's stated policy relieves it of that statutory responsibility by automatically disqualifying *any* order submitted to the PBGC after the alternate payee begins receiving payment under a separate-interest order. See PBGC Operating Policy Manual 6–6.3(F)(2)(d). To be sure, a later order could "potentially" result in increased benefits, as illustrated by the hypothetical scenario offered by the Appeals Board to support its decision. See supra n.1. But that is not necessarily so. There is nothing inherent in an alternate payee's receipt of benefits under a separate-interest order that would cause a subsequent shared-interest order to require an increase in benefit payments. One can easily imagine scenarios where, unlike in the agency's hypothetical, the alternate payee could be expected to live much longer than the participant. In such a case, a new shared-interest order would likely reduce the total amount of benefit payments. The PBGC's blanket disqualification of all such orders is, therefore, arbitrary, capricious, and contrary to 29 U.S.C. § 1056(d)(3)(D)(ii).

A related flaw in PBGC policy (and the Appeal Board's reliance on it) is that the statute tells the agency precisely how to determine whether a subsequent order will require the plan to

pay increased benefits: "on the basis of actuarial value." 29 U.S.C. § 1056(d)(3)(D)(ii).  Yet the policy, as applied by the Appeals Board here, rejects *all* subsequent orders if the alternate payee has already begun to receive payments, without regard to actuarial value.  A.R. 6.  When questioned at oral argument as to how the PBGC could go about determining the actuarial value of future benefit payments, PBGC counsel acknowledged that the agency would consult the applicable mortality tables, which estimate a person's expected lifespan based on gender and current age.[2]  Nowhere in the record, however, is there any indication that the PBGC ever undertakes that assessment.  In other words, the PBGC does not consider "actuarial value" when assessing whether a new form of benefit will result in increased payments relative to a prior one, as Congress instructed; rather, it ignores that factor altogether and simply assumes that the mere potential for increased benefits is enough to keep a domestic relations order from being qualified.  Because that policy, and thus the Appeals Board decision, disregards a basis of comparison required by Congress, it is both arbitrary and capricious, and contrary to the agency's statutory mandate.[3]

---

[2] Counsel further suggested that determining "actuarial value" would not require consideration of the individual health status of the participant and alternate payee.  The Court takes no position on that issue at this juncture, except to say that it must (and will) defer to the agency's reasonable interpretation of that statutory term.

[3] In it summary judgment briefing, the PBGC attempts to defend the decision not to qualify the 2012 domestic relations order on grounds other than the agency's "already in pay status" policy.  See Def.'s Mem. Supp. Mot. Summ. J. ("MSJ") 11–12.  Specifically, the agency argues that the potential increased benefits payments resulting from a new shared-interest order "can" also result in a change in the "type or form of benefit…not otherwise provided under the plan" in violation of the first of the three QDRO conditions cited above.  29 U.S.C. § 1056(d)(3)(D)(i); see also id.  While this argument would appear to suffer from similar flaws as the agency's reliance on subsection (d)(3)(D)(ii), the Court need not resolve the issue here.  That is so because "it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).  As PBGC counsel conceded at oral argument, neither the agency nor the Appeals

## IV.    Conclusion

Having found the PBGC's decision not to qualify the 2012 domestic relations order deficient under § 706 of the APA, the Court will vacate the agency's decision and remand the case to the PBGC for further consideration of the order consistent with this ruling. A separate Order accompanies this Memorandum Opinion.[4]

**SO ORDERED**.

                                                                                                       CHRISTOPHER R. COOPER
                                                                                                       United States District Judge

Date:  March 20, 2017

---

Board relied on that position in declining to qualify the 2012 order. The Court therefore may not consider it now.

[4] Mr. Dullea has also filed a motion to compel the PBGC to produce various documents, including correspondence with Ms. Potrament in connection with the 2008 QDRO and an internal PBGC brochure outlining the agency's procedures for qualifying domestic relations orders. The Court will construe this motion as one to supplement the administrative record.

"For a court to supplement the record, [Dullea] must rebut the presumption of administrative regularity and show that the documents to be included were before the agency decisionmaker[.]" Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Engineers, 448 F. Supp. 2d 1, 6 (D.D.C. 2006). He has failed to do that here. As set forth in the Appeals Board decision, the agency declined to qualify the 2012 order based simply on the terms of the order itself; the terms of the 2008 order; the fact that Mr. Potrament's benefit had been in pay status since 2009; and the relevant rule from the PBGC's policy manual. See A.R. 5–7. All of those materials were offered by the PBGC and included in the administrative record. Dullea has not shown that the agency reviewed (or needed to review) any other materials in reaching the determination that is now before the Court. The other materials he requests are, therefore, outside the scope of the Court's narrow review of the agency's decision under the APA. While Mr. Dullea is free to request these materials through a FOIA request, which apparently he has done, they have no bearing on the issue before the Court today. Accordingly, the Court will deny his motion to supplement the administrative record.